IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

WENDY BARNARD,                          §
                                        §
                    Plaintiff,          §
                                        §   Civil Action No. 3:16-CV-0282-D
VS.                                     §
                                        §
L-3 COMMUNICATIONS                      §
INTEGRATED SYSTEMS L.P.,                §
                                        §
                    Defendant.          §

MEMORANDUM OPINION
AND ORDER

In this action alleging claims for age discrimination under the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Texas Commission on

Human Rights Act ("TCHRA"),[1] Tex. Labor Code Ann. § 21.001 *et seq.* (West 2015), and

disability discrimination under the Americans with Disabilities Act of 1990 ("ADA"), 42

U.S.C. § 12101 *et seq.*, and the TCHRA, defendant L-3 Communications Integrated Systems,

L.P. ("L-3") moves for summary judgment. For the following reasons, the court grants the

motion and dismisses this action by judgment filed today.

---

[1]As the court noted in *King v. Enterprise Leasing Co. of DFW*, 2007 WL 2005541
(N.D. Tex. July 11, 2007 ) (Fitzwater, J.): "Chapter 21 was entitled the Texas Commission
on Human Rights Act until the abolishment of the Commission on Human Rights. In 2004,
the 'powers and duties' of the Commission on Human Rights were transferred to the Texas
Workforce Commission Civil Rights Division." *Id.* at *1 n.1 (quoting *Tex. Dep't of Criminal
Justice v. Guard*, 2007 WL 1119572, at *2 n.3 (Tex. App. 2007, no pet.) (not designated for
publication)). As in *King*, the court for clarity will refer to these claims as brought under the
TCHRA.

Plaintiff Wendy Barnard ("Barnard") was hired in 1999 by defendant L-3, a manufacturing facility specializing in the modification of military aircraft for the United States Department of Defense and allied governments.[2]  At the time of her termination, Barnard was working for L-3 as a Material Requirements Planner ("MRP") under the supervision of Christopher J. Lytle ("Lytle") and Regina Chandler ("Chandler").  Barnard maintains that her daily job duties involved sitting at an office desk and working at a computer, and that she did not work on or operate heavy equipment, trucks, forklifts, or scooters, did not work in the shops, and did not work on the flight line or on aircraft.

All employees of L-3 are required as a condition of employment to comply with L-3's Substance Abuse Policy ("Policy").[3]  Under the Policy, the use of any drug that adversely affects an employee's job performance or safety is prohibited.  L-3 employees are also prohibited from being on L-3's premises under the influence of drugs or alcohol, and all employees are subject to random drug screens.  L-3 employees are also subject to reasonable cause/reasonable suspicion drug testing based on an observed impairment, such as slurred

---

[2]In deciding this motion, the court views the evidence in the light most favorable to Barnard as the summary judgment nonmovant and draws all reasonable inferences in her favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

[3]According to Barnard, L-3 had at least two written substance abuse policies: a Substance Abuse Policy and Control Program (Policy No. 305), *see* P. Appx. 123-28, and a Substance Abuse Policy, *see id.* at 34-59.  Unless the context requires more specificity, the court will refer to both of these documents as the "Policy."

speech, disorientation, or glassy eyes.  Under the Policy, if an employee tests positive for drugs, she may be suspended without pay pending further review.

During her employment with L-3, Barnard was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), for which she took legally-prescribed Adderall.  She also suffered from chronic back pain caused by a degenerative back condition, for which she took legally-prescribed Hydrocodone.  In July 2009 L-3 selected Barnard for a random drug screening.  In connection with this screening, Barnard disclosed to L-3 that she was taking prescription Adderall to manage her ADHD.  Although Barnard tested positive for amphetamines, an ingredient in Adderall, L-3 permitted Barnard to return to work and did not instruct her that she could not take Adderall before coming to work or at any other time.

On an April 28, 2014 Medication Information form, Barnard indicated that she had been prescribed Hydrocodone.  L-3 maintains that at the time she filled out the form, Barnard was given a "narcotic warning" that she could not take Hydrocodone six to eight hours prior to coming to work.

On March 20, 2015 Barnard informed Lytle that she was taking prescription Hydrocodone for her back pain.  Lytle sent Barnard to L-3's medical department for an examination.  Barnard disclosed to the attending nurse, who she believes was Rachel Lancaster ("Lancaster"), that she was taking Hydrocodone as prescribed for her back pain. L-3 maintains that its company policy specifically precluded the use of any narcotic pain medication by any employee six hours prior to coming to work, and that nurses were required to provide this instruction to all employees who were taking any narcotic pain medications.

Barnard contends that although Lancaster initially told Barnard not to take the prescribed medication for four to six hours prior to coming to work in the mornings, Lancaster changed her position after Barnard explained the nature of her sedentary desk computer job duties.[4] According to Barnard, Lancaster told Barnard that it would be okay for her to take the Hydrocodone as prescribed, and that she would let Lytle know "it was all ok." P. Br. 11.

Barnard and L-3 offer different versions of the events leading up to Barnard's May 5, 2015 termination. According to L-3, Lytle and Chandler conducted an early morning staff meeting on April 22, 2015 during which they both noticed that Barnard appeared to be "out of it" and very lethargic. Two days later, Susan Payne ("Payne"), a fellow L-3 employee, observed Barnard in the restroom. Payne noticed that Barnard had a glazed look, slurred speech, and appeared to be impaired, and she reported Barnard's behavior to Lytle.

Barnard disputes that she was lethargic or "out of it" during the April 22, 2015 staff meeting. She also explains that, on April 22, 2015, she underwent a cosmetic procedure that caused swelling and painful fever blisters on her lips, and that she had been examining and putting ointment on her swollen lips when Payne encountered her in the restroom on April 24, 2015. She contends that she did not have slurred speech that day, although the painful fever blisters on her swollen lips made it more difficult to talk, and that she was neither dizzy nor drowsy that morning and had no problems at all doing her work.

---

[4]Barnard maintains that she explained to Lancaster that she worked on a computer exclusively at a sedentary desk job, did not work in the shops, did not work on or operate heavy equipment, and did not work on aircraft or the flight line; that the medication did not make her dizzy or drowsy; and that she did not climb stairs at work.

Based on his own observations during the April 22, 2015 staff meeting and the behavior Payne reported, Lytle determined that Barnard should be required to take a reasonable cause/reasonable suspicion drug test. Barnard consented and tested positive for methamphetamines, opioids, and amphetamines.[5] When she reviewed the results of the drug test, she signed the result sheet, and did not dispute that she had tested positive for these substances. She also admitted that she took pain medication on the morning of April 24, 2015 and that she takes such medication every morning.

Barnard was suspended pending further investigation and was not allowed to return to work. On May 5, 2015 L-3 terminated Barnard's employment. According to L-3, Barnard's employment was terminated for three reasons: (1) she had violated L-3 company policies and was incapacitated, incoherent, and impaired in the workplace; (2) she disregarded the prior narcotic warnings and took narcotics prior to coming to work on April 24, 2015; and (3) she failed to disclose on her March 20, 2015 Medical Information sheet that she was taking Adderall.

At the time of her termination Barnard was working as a nonexempt Supply Chain Associate. After she was terminated, L-3 opened a requisition to fill Barnard's prior position, but the position remained unfilled. On July 18, 2015, almost two months after Barnard's

<hr />

[5]L-3 contends that Alita Hammett, the nurse on duty who conducted Barnard's drug test, observed that Barnard's speech was slurred and that she appeared to be under the influence of some type of substance.

termination, Carrie Ingram ("Ingram"), a 38-year-old employee of L-3,[6] was promoted to an exempt Material Planning and Control Specialist position. L-3 maintains that as a Material Planning and Control Specialist, Ingram assumed the duties of the nonexempt Supply Chain Associate position that Barnard had previously performed, and that Barnard was not replaced; instead, her job duties were assigned to another exempt employee who performed additional job duties for L-3.

Barnard filed this lawsuit against L-3, alleging claims for disability discrimination, including failure to reasonably accommodate, in violation of the ADA and TCHRA, and age discrimination, in violation of the ADEA and TCHRA. L-3 moves for summary judgment on Barnard's claims. Barnard opposes the motion.

## II

When a party moves for summary judgment on claims on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmovant must go beyond her pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor. *Anderson v.*

---

[6]L-3 contends Ingram was 40 years old at the time she was promoted to the position of exempt Material Planning and Control Specialist.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

III

The court turns first to Barnard's claim for failure to accommodate under the ADA and TCHRA.

A

The ADA prohibits discrimination in employment against a qualified individual on the basis of her disability. *See* 42 U.S.C. § 12112(a). Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). Similarly, the TCHRA provides that it is unlawful for an employer "to fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability . . . unless [the employer] demonstrates that the accommodation would impose an undue hardship on the operation of the business." Tex. Lab. Code Ann. § 21.128(a).

The elements of a failure-to-accommodate claim under the ADA and TRHCA are

substantially similar. To prevail on an ADA failure-to-accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (footnote and internal quotation marks omitted). Under the TCHRA, to establish a claim "based on an employer's failure to provide a reasonable accommodation, the plaintiff must show: (1) she is an individual with a disability; (2) the employer had notice of the disability; (3) with reasonable accommodations she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Tex. Dep't of State Health Servs. v. Rockwood*, 468 S.W.3d 147, 154-55 (Tex. App. 2015, not pet.).

## B

L-3 moves for summary judgment on Barnard's failure-to-accommodate claim on the ground that Barnard's alleged disability on the basis of ADHD was not open and obvious and Barnard never provided any written documentation to L-3 that she had any restrictions or limitations that required reasonable accommodations for her ADHD. Moreover, Barnard testified during her deposition that she was not under any physician restrictions that limited her ability to work as a result of her ADHD, nor did she request any accommodation regarding her ADHD. *See* D. App. 56 (Barnard testified that other than allowing her to screen print and take notes during training, she did not request any accommodation to address concerns or problems she was experiencing from her ADHD).

In response, Barnard contends that she requested a reasonable accommodation to take prescribed medication (Adderall) for her diagnosed and disclosed ADHD, and to take prescribed medication (Hydrocodone) for her diagnosed and disclosed chronic back pain from a degenerative back condition. Barnard maintains that she "was not reasonably accommodated and afforded the opportunity to explain the test results or have her physician rectify the situation prior to her May 5, 2015 termination and after the April 24, 2015 drug screen as provided by L-3 policy." P. Br. 42-43. She also contends that L-3's

> supervisors and nurse personnel that were well aware of Plaintiff's disabilities and use of prescribed medication to treat same yet Defendant proceeded to terminate Plaintiff's employment without followup or engagement in the ADA interactive process to see if she could be reasonably accommodated to perform her job given the disclosure of Plaintiff's ADHD and chronic back pain disabilities and prescription medications needed to treat same. Defendant could have reasonably accommodated Plaintiff and easily offered Plaintiff a leave of absence, referral to the company employee assistance program or even up to 12 weeks of job protected FMLA leave or other short-term leave given her long tenure to receive time off for any suggested assessment, treatment and recovery to exhaust all avenues short of termination.

P. Br. 43.

L-3 replies, *inter alia*, that it is undisputed that Barnard never requested any accommodation for her ADHD or her occasional back pain that was not provided by L-3, and that there can be no liability for a failure to accommodate when Barnard never requested an accommodation due to any alleged disability that was denied by L-3.

C

To the extent Barnard contends that L-3 failed to accommodate her diagnosed and disclosed chronic back pain from a degenerative back condition, she has not pleaded such a claim. The only disability Barnard alleges in her complaint is ADHD. In fact, nowhere in her complaint does Barnard even mention back pain caused by a degenerative back condition. Accordingly, Barnard cannot rely on this new claim (i.e., failure to accommodate Barnard's chronic back pain) as a basis to avoid summary judgment. *See, e.g., Orthoflex, Inc. v. ThermoTek, Inc.*, 983 F.Supp.2d 866, 873 (N.D. Tex. Oct. 31, 2013) (Fitzwater, C.J.) ("[A] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." (quoting *Bennett v. Dall. Indep. Sch. Dist.*, 936 F.Supp.2d 767, 781 (N.D. Tex. 2013) (Fitzwater, C.J.))), *appeal docketed*, No. 16-11381 (5th Cir. Sept. 16, 2016).

Even assuming *arguendo* that Barnard had properly pleaded a failure-to-accommodate claim based on her degenerative back condition, she has not adduced any evidence that would enable a reasonable jury to find that she ever requested an accommodation for either her chronic back pain or her ADHD that she did not receive. Under the ADA, it is unlawful for an employer to fail to accommodate the *known* limitations of an employee's disability. "An employee who needs an accommodation because of a disability has the responsibility of informing her employer." *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009). "[The Fifth Circuit] has recognized that 'where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent

to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.'" *Id.* (quoting *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996)); *see also Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 n.4 (5th Cir. 1999) ("Employers cannot be expected to anticipate all the problems that a disability may create on the job and spontaneously accommodate them. Accordingly, the burden is on the employee to request an accommodation." (citations omitted)). "When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *EEOC v. Agro Distrib, LLC*, 555 F.3d 462, 471 (5th Cir. 2009).

Barnard suggests in her summary judgment response that L-3 violated the ADA and TCHRA when it terminated her employment without first engaging in the interactive process[7] to determine whether Barnard could be reasonably accommodated through a leave of absence, referral to the company employee assistance program, or protected Family and Medical Leave Act or other short term leave.[8] But Barnard has not introduced any evidence

---

[7]To the extent that Barnard contends that she "was not reasonably accommodated and afforded the opportunity to explain the test results or have her physician rectify the situation," P. Br. 42, she is actually complaining about L-3's alleged failure to follow its own internal policies rather than L-3's refusal to make a reasonable accommodation for her *disabilities*.

[8]Barnard also contends that she "was told her physical therapy appointments were too repetitive and she would be charged PTO and not be allowed to make up her time," P. Br. 41, but she neither alleges in her complaint nor argues in her response brief that the denial of paid leave for physical therapy appointments for her degenerative back condition

that would enable a reasonable jury to find that the necessary reasonable accommodations for her ADHD or chronic back pain were obvious, or that she ever requested any of the accommodations she proposes in her brief. *See, e.g., Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) ("[W]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." (citations omitted)); *Chevron Phillips Chem. Co.*, 570 F.3d at 621 ("An employee who needs an accommodation because of a disability has the responsibility of informing her employer."). In fact, Barnard admits that she never requested an accommodation other than asking to be allowed to print out materials during training and asking for an ergonomic chair, both of which were granted.[9] Accordingly, the court grants L-3's motion for summary judgment dismissing Barnard's failure-to-accommodate claims under the ADA and TCHRA.

---

constituted a failure to accommodate under the ADA or TCHRA.

[9]*See* D. App. 56 ("Q. And so other than allowing you to screen print and to take notes so you can facilitate your learning while you were training, did you ask L-3 for any other accommodations to address any concerns or problems you were experiencing caused by your ADHD? A. Not that I know of."); *id.* at 45 ("Q. Did you or did you not make any other requests of Mr. Lytle or Ms. Chandler to accommodate you in any way with respect to your back problems, other than getting you an ergonomic chair? A. No. Q. And the one request you made that you be provided with an ergonomic chair, they provided to you, didn't they? A. Yes.").

IV

The court turns next to Barnard's claim that L-3 violated the ADA and TCHRA by discriminating against her based on her disability.

A

Because Barnard relies on circumstantial evidence to support her ADA claim,[10] it is properly analyzed under the *McDonnell Douglas*[11] burden shifting framework. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999) (holding that *McDonnell Douglas* framework applies to ADA cases when only circumstantial evidence of discrimination is offered). As modified, the *McDonnell Douglas* framework consists of three stages. First, Barnard must establish a prima facie case of discrimination, which "creates a presumption that [L-3] unlawfully discriminated against [her]." *Tex. Dep't of Cmty. Affairs v. Burdine*,

_____

[10]Although Barnard has brought her claim under both the ADA and the TCHRA, the court for convenience will refer only to the claim brought under the ADA because substantially the same law applies to both claims. *See, e.g., Gober v. Frankel Family Tr.*, 537 Fed. Appx. 518, 520 (5th Cir. 2013) (per curiam). The inquiries under the ADA and TCHRA are identical under the first and second stages of the modified *McDonnell Douglas* framework. *See, e.g., Mathis v. BDO USA, LLP*, 2014 WL 975706, at *3 (S.D. Tex. Mar. 12, 2014). Although under the TCHRA Barnard can survive summary judgment by producing evidence from which a reasonable trier of fact could find that, even if L-3's reason is true, another motivating factor was her disability, *see Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) ("The plain meaning of this statute establishes 'a motivating factor' as the plaintiff's standard of causation in a TCHRA unlawful employment practice claim, regardless of how many factors influenced the employment decision."), and, for the reasons explained *infra* at note 13, it is unclear whether Barnard can proceed under a mixed-motives theory for her ADA claim, the difference between these two standards is immaterial in this case because Barnard has only attempted to show that L-3's proffered legitimate, nondiscriminatory reason is pretextual.

[11]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

450 U.S. 248, 254 (1981).  To establish a prima facie case of discrimination based on a disability under the ADA, Barnard must show that (1) she had a disability, (2) she was qualified for the job, and (3) there was a causal connection between an adverse employment action and her disability.[12]  *Rodriguez v. Eli Lilly & Co*., 820 F.3d 759, 765 (5th Cir. 2016) (citing *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)).

Second, if Barnard establishes a prima facie case, the burden shifts to L-3 to articulate a legitimate, nondiscriminatory reason for the employment action taken against her.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).  L-3's burden is one of production, not proof, and involves no credibility assessments.  *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).  This "burden requires the production of admissible evidence in support of its nondiscriminatory reasons."  *Hervey v. Miss. Dep't of Educ*., 404 Fed. Appx. 865, 868 (5th Cir. 2010) (per curiam) (citing *Burdine*, 450 U.S. at 255).

---

[12]There is "a discrepancy in the Fifth Circuit's cases evaluating the requisite nexus between an employee's disability and her termination."  *EEOC v. LHC Grp., Inc*., 773 F.3d 688, 695 (5th Cir. 2014).  In *LHC Group* the Fifth Circuit held that, "'[t]o establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability.'"  *Id*. at 697 (brackets omitted) (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)); *but see, e.g., McCollum v. Puckett Mach. Co.*, 628 Fed. Appx. 225, 229-30 (5th Cir. 2015) (per curiam) (holding that a plaintiff must show: "(1) [h]e is disabled, (2) he is qualified for his job, (3) he was subjected to an adverse employment action on account of his disability and (4) he was replaced by or treated less favorably than non-disabled employees.").  Although L-3 cites some examples of the disputed fourth element, the court follows the *LHC Group* formulation, for the reasons set out in that case.  *See LHC Grp*., 773 F.3d at 695-97.

- 14 -

Third, if L-3 meets its production burden by producing evidence of a legitimate, nondiscriminatory reason for the adverse employment action, "the presumption of discrimination created by [Barnard's] prima facie case disappears," *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005), and "the burden shifts back to [Barnard] to make an ultimate showing of intentional discrimination," *Campbell v. Zayo Grp., LLC*, 2015 WL 3903539, at *3 (N.D. Tex. June 25, 2015) (Fitzwater, J.) (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012)). Barnard must show that the legitimate, nondiscriminatory reason proffered by L-3 "[is] not its true reason[ ], but [was] a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also Chevron Phillips Chem. Co.*, 570 F.3d at 615.[13] Therefore, to survive summary judgment, Barnard must "offer sufficient evidence to create a genuine issue of material fact . . . that [L-3's] reason is not true, but is instead a pretext for discrimination." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citation and internal quotation marks omitted) (describing standard in context of age discrimination case). At the summary judgment stage, of course, Barnard is only obligated to raise a

---

[13]As this court has previously observed, it is unclear whether the mixed-motives alternative to rebutting a defendant-employer's proffered legitimate reason is still viable in ADA discrimination cases after the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 (2009) (holding that mixed-motives theory is unavailable under the ADEA). *See Thomas v. Greystar Mgmt. Servs., L.P.*, 2014 WL 2519165, at *3 n.4 (N.D. Tex. June 4, 2014) (Fitzwater, C.J.). The court need not decide whether the mixed-motives theory is available here, because, as the court explains below, although Barnard cites the law regarding mixed-motives, she has only attempted to show that L-3's proffered legitimate, nondiscriminatory reason is pretextual.

genuine issue of material fact regarding pretext. *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) ("Because [defendant] has satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff's] discharge, in order for [plaintiff] to survive summary judgment, [s]he must create a genuine and material fact issue regarding the ultimate question of discrimination.").

These three steps constitute the *McDonnell Douglas* framework. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (alteration in original) (quoting *Burdine*, 450 U.S. at 253).

## B

Because the court holds below that Barnard has failed to meet her burden to create a genuine issue of material fact on the issue of pretext, it will assume *arguendo* that Barnard has established a prima facie case.

## C

The court now turns to the second stage and determines whether L-3 has met its burden of production. L-3 has met this burden because its evidence shows that it had a legitimate, nondiscriminatory reason for terminating Barnard's employment. L-3 has adduced evidence that it terminated Barnard's employment because Barnard violated L-3's Policy by reporting to work under the influence of a narcotic; Barnard disregarded the narcotic warnings that she had received and took narcotics before reporting to work; and

Barnard failed to list numerous medications on her Medical Information form[14] in March 2015, prior to being administered a drug test in April 2015. "Violation of company policy is a legitimate, nondiscriminatory reason for termination." *Harris v. Dall. Cnty. Hosp. Dist.*, 2016 WL 2914847, at *10 (N.D. Tex. May 19, 2016) (Fitzwater, J.) (citing *Mendez v. Dollar Tree Stores, Inc.*, 114 Fed. Appx. 149 (5th Cir. 2004) (per curiam)).

### D

Because L-3 has met its burden of production, the burden shifts back to Barnard to present evidence that would enable a reasonable jury to find that L-3's reason is pretextual.

### 1

L-3 contends that Barnard cannot show that L-3's reasons for terminating her were a pretext for disability discrimination because Barnard has admitted that she ignored the narcotic warnings given by L-3, failed to list Adderall on her March 20, 2015 Medical Information form, and tested positive for Hydrocodone on April 24, 2015; L-3 has presented evidence that, on the day in question, Barnard had slurred speech, was incoherent, and could not perform her job duties; and Barnard therefore cannot show that L-3's reasons for terminating her were unworthy of credence or were false.

Barnard appears to argue in response that L-3's purported legitimate, nondiscriminatory reason for terminating Barnard's employment is false because Barnard

---

[14]L-3 contends, and Barnard does not dispute, that at the time of her drug screen on April 24, 2015, Barnard was also taking Gabapentin, Atenolol, Levothyroxine, Risperidone, Sertraline, and Simvastatin, and failed to disclose these six medications and Adderall on her Drug Information Sheet prior to her test, as required by L-3 policy.

reported timely for work and was doing her job when she was drug tested on April 24, 2015; Barnard had been given prior instructions from the L-3 nurse that it was okay to take Hydrocodone for her back pain prior to coming to work given the sedentary desk job duties Barnard performed; and Barnard had disclosed her prescribed medications prior to termination "with no reasonable accommodation offered by [L-3] to reduce any alleged 'direct threat' presented by Plaintiff." P. Br. 37. Barnard also maintains that L-3 has given "inconsistent and incredible reasons in this case for [her] termination as shown by the fact that in its motion [L-3's] counsel argue[d] three reasons for termination of employment when none of Defendant's supporting affidavits state more than two reasons for termination and there was no affidavit . . . given by the ultimate decisionmaker on [Barnard's] termination with the lone unverified HR note only stating one reason for termination." *Id.* at 39.

2

The court concludes that no reasonable jury could find that L-3's reasons for terminating Barnard's employment are pretextual. L-3 contends that one of the reasons Barnard was discharged was because she violated L-3's Policy by reporting to work under the influence of a narcotic. L-3's Policy prohibits, *inter alia*, "[t]he use of any drug including alcohol where such use adversely affects the employee's job performance, the productivity of other employees, or the safety of the employee, other employees, or members of the public." D. App. 22. Barnard does not dispute that she in fact took Hydrocodone before

reporting to work on April 24, 2015[15]; that Payne reported to Lytle that Barnard had a glazed look, slurred speech, and that she appeared to be impaired; and that she tested positive for methamphetamines, opioids, and amphetamines during the April 24, 2015 drug screen.

Barnard disputes the reason that she had slurred speech on April 24, 2015—she contends that the painful three ugly fever blisters on her swollen lips stung and made it more difficult to talk—and contends that she was neither dizzy nor drowsy that morning and had no problems doing her work at all.[16] She also contends that she "had always been able to perform the essential functions of her job for L-3 with the assistance and use of her

---

[15]Barnard contends that Lancaster, a nurse who worked at L-3 and who had no supervisory authority over Barnard, informed Barnard that "it would be ok for Plaintiff to take the Hydrocodone and medication as prescribed and that she would let Plaintiff's supervisor [Lytle] know it was all ok." P. Br. 11. But Barnard has produced no evidence that Lytle or anyone else in a supervisory position at L-3 approved Barnard's taking Hydrocodone before reporting to work, or that Lytle even knew that Lancaster had told Barnard that she could do so.

[16]Barnard also attempts to establish pretext by arguing that L-3 has given "inconsistent and incredible" reasons for her termination. P. Br. 39. But the examples she cites in her brief show only that L-3 has consistently stated that Barnard was being terminated because she arrived at work on April 24, 2015 under the influence of narcotic pain medication, in violation of L-3's Policy. *See* D. App. 20 (Lytle's affidavit in which he avers that "[Barnard]'s employment was terminated because on April 24, 2015 she was incoherent, had difficulty speaking, and was under the influence of narcotic pain medication in the workplace in violation of company policy and specific instructions she had previously been given."); *id.* at 142 (Chandler's affidavit in which she avers that "[Barnard]'s employment was terminated because on April 24, 2[01]5 she was incoherent, had difficulty speaking, and was under the influence of narcotic pain medication in the workplace in violation of company policy and specific instructions she had previously been given"); *id.* at 153 (Memorandum for Record by Dwight Wilkins from Human Resources stating "Barnard was informed that she was terminated effective May 5, 2015 for being at work under the influence as a result of a controlled substance and being incapacitated and incapable of performing her assigned duties on April 24, 2015.").

prescribed medications." P. Br. 15. Yet Barnard adduces no evidence that would enable a reasonable jury to find that the decisionmakers at L-3, including L-3's Human Resources Department[17] and one of Barnard's supervisors (Lytle), did not *actually believe* that Barnard's drug use on April 24, 2015 "adversely affect[ed] [Barnard's] job performance," in violation of L-3's Policy. D. App. 22. Moreover, even if the decisionmakers at L-3 were incorrect that Barnard's conduct on April 24, 2015 violated L-3's Policy, this is an insufficient basis to enable a reasonable jury to find pretext. *See Harris*, 2016 WL 2914847, at *11(citing cases); *see also, e.g., Dickerson v. Metro. Dade Cnty.*, 659 F.2d 574, 581 (5th Cir. Unit B Oct. 1981) (observing that even if employer was wrong in its evaluation of employee's absenteeism, it did not violate Title VII if it acted on reasonable belief); *Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F.Supp.2d 197, 204 (D. Conn. 2008) (holding that employee failed to show that employer's reason for terminating him, even if shown to be wrong or mistaken, was pretextual, and quoting Third Circuit holding that, "[t]o discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." (alteration in original) (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995))).

---

[17]Lytle and Chandler both aver in their affidavits that "the decision to terminate [Barnard's] employment was ultimately made by L-3's HR Department." D. App. 20; *id.* at 142.

Barnard also contends that she was not offered any warning in lieu of termination or offered any counseling or corrective action or other alternatives, and that she was not given a full opportunity to explain or rectify the test results per section 3.3D of L-3's Substance Abuse Policy and Control Program (Corporate Policy No. 305).[18]  Barnard testified at her deposition, however, that she was shown the results of her drug test; that she was given the opportunity to review the results; that she spoke with the nurse who had performed the drug test, and broke down in tears, telling her that she had been up all night studying for several days in a row; that Dwight Wilkins ("Wilkins"), from L-3's Human Resources Department, reviewed the test results with Barnard and told Barnard he would have to suspend her pending an investigation; that Barnard did not recall saying anything specific to Wilkins, did not object to being suspended, and did not tell Wilkins that she had a prescription for all of the drugs for which she had tested positive; and that when she met with Lytle and Wilkins on May 5, 2015, during a meeting that lasted 15-20 minutes, Barnard was informed that she was being terminated because she had failed to disclose that she was taking Adderall, there

_____

[18]This section states:

> An employee testing positive will be allowed an opportunity to explain the test results.  However, any employee whose drug screen is confirmed positive by a second test on the same sample for the use of illegal drugs or non-prescription controlled substances . . . may be suspended with (or without) pay and, depending upon the circumstances surrounding the infraction of the company drug policy, may be terminated from employment.

P. App. 127.

was concern about her ability to perform her job duties and functions on April 24, 2015, and because she had taken hydrocodone before coming to work, in violation of instructions she had been given. Barnard does not offer any reason why she could not have fully explained the test results, including "the fact that she was told by the L-3 nurse [Lancaster] that it was ok to take Hydrocodone for her back pain prior to coming to work given the nature of her sedentary job duties," P. Br. 23, when she was reviewing the test results on April 24, 2015 during her discussion with the nurse on duty, or when she met with Wilkins and Lytle on May 5, 2015. Moreover, the provision of L-3's Substance Abuse Policy and Control Program on which she relies specifically authorizes termination from employment, and does not require that any alternative measures be taken. *See* P. App. 127.

Barnard does not address L-3's other proffered legitimate, nondiscriminatory reason for her termination: Barnard's failure to list Adderall on her Medical Information form in March 2015. L-3's Medical Information form requires employees to list "each medication for which you have a current prescription." D. App. 148. Barnard does not dispute that she failed to list Adderall on her March 2015 Medical Information form.[19] This court has repeatedly held that, where an employer offers more than one legitimate, nondiscriminatory reason for taking the adverse employment action that the plaintiff challenges, "'[t]he plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer

_____

[19]Barnard instead contends that she disclosed her use of Adderall to the nurse on duty prior to her April 24, 2015 drug test, and that she did not think she had to disclose it on the March 2015 Medical Information form because she had disclosed her use of Adderall in 2009.

articulates.'" *Kretchmer v. Eveden, Inc.*, 2009 WL 854719, at *7 (N.D. Tex. Mar. 31, 2009)

(Fitzwater, C.J.) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir.

2001)), *aff'd*, 374 Fed. Appx. 493 (5th Cir. 2010); *see also Jackson v. Watkins*, 2009 WL

1437824, at *8 (N.D. Tex. May 21, 2009) (Fitzwater, C.J.), *aff'd*, 619 F.3d 463 (5th Cir.

2010).  As the Fifth Circuit has explained in the analogous context of a discrimination claim

under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*:

> Because our precedent is clear that a plaintiff asserting a Title
> VII claim must rebut each of the defendant's nondiscriminatory
> reasons in order to survive summary judgment, [plaintiff's]
> contention that he is required to rebut only some of
> [defendant's] reasons is without merit.  We have long
> recognized that to satisfy step three of the *McDonnell Douglas*
> framework, a plaintiff must put forward evidence rebutting each
> of the nondiscriminatory reasons the employer articulates.
> Where a plaintiff falls short of his burden of presenting evidence
> rebutting *each* of the legitimate nondiscriminatory reasons
> produced by the employer, summary judgment is appropriate.
> Accordingly, [plaintiff] cannot withstand summary judgment
> without providing sufficient evidence to rebut each of
> [defendant's] nondiscriminatory reasons.

*Jackson v. Watkins*, 619 F.3d 463, 467 (5th Cir. 2010) (per curiam) (citations, quotation

marks, and brackets omitted).  Additionally, "[t]he evidence offered to counter the

employer's proffered reasons must be substantial."  *Kretchmer*, 2009 WL 854719, at *7

(citing *Wallace*, 271 F.3d at 220).  Because Barnard does not dispute that L-3 terminated her

employment based on her failure to list Adderall on her March 2015 Medical Information

form,[20] she has failed to raise a genuine issue of material fact, with respect to each of the reasons L-3 has provided for her termination, that they are pretextual and are not the real reasons L-3 decided to terminate her employment.

Accordingly, the court holds that L-3 is entitled to summary judgment dismissing Barnard's ADA discrimination claim.

V

To the extent Barnard argues in her response brief that L-3's Policy violates the ADA and TCHRA, she has not properly pleaded a claim based on L-3's Policy.

A

In her response brief, Barnard devotes several pages to the argument that L-3's Policy requiring all employees to disclose all prescription drugs is unlawful under the ADA and TCHRA. She maintains that the ADA limits an employer's ability to make disability-related inquiries or require medical examinations during employment; that after employment begins, an employer may make disability-related inquiries and require medical examinations only

---

[20]To the extent Barnard argues that L-3 has given "inconsistent and incredible" reasons for her termination, P. Br. 39, the evidence she cites shows that Wilkins noted in his documentation of "activity concerning the termination of [Barnard]," that

> First Aid reported that while Ms. Barnard listed several medications on her most recent medication sheet (dated March 20, 2015) she failed to list Adderal[l], a drug she had been warned/counseled about previously. First Aid made Ms. B[a]rnard aware that she did not report the Adderal[l] to the Company on the most current sheet of March 20, 2015.

D. App. 153.

if they are job-related and consistent with business necessity; that tests for prescription medications are considered medical examinations under the ADA and therefore such tests must be job-related and consistent with business necessity; that, generally, an employer may not ask all employees what prescription medications they are taking, but that, in limited circumstances, certain employers may be able to demonstrate that it is job-related and consistent with business necessity to require employees in positions affecting public safety to report when they are taking medication that may affect their ability to perform essential functions; that an employer must be able to demonstrate that an employee's inability or impaired ability to perform essential functions will result in a "direct threat"; that if an employer decides to terminate or take other adverse action against an employee with a disability based on the results of a medical examination, the employer must demonstrate that the employee is unable to perform her essential job functions, or that she in fact poses a "direct threat" that cannot be eliminated or reduced by reasonable accommodation; and that the summary judgment evidence shows that Barnard was not a "direct threat" to herself or others, and L-3's summary judgment evidence does not show otherwise, or that L-3 made any attempt to reduce any alleged "direct threat" of Barnard by reasonably accommodating her or complying with its Policy or engaging in the ADA interactive process.

L-3 replies that, prior to filing her response, Barnard has never alleged that L-3's Policy was unlawful on its face, and that the court should therefore disregard these arguments.

The ADA contains a broad prohibition against the discriminatory use of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(6). One type of defined "qualification standard" is the use of medical examinations and inquiries, except in certain circumstances. *Id.* § 12112(d). Section 12112(d)(4)(A) states that "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." In her response brief, Barnard appears to argue, at least in part, that L-3's Policy violates 42 U.S.C. § 12112(d)(4)(A). But Barnard has not alleged a claim based on L-3's violation of this provision of the ADA. In fact, nowhere in Barnard's complaint does she even *mention* L-3's Policy or the ADA's limitations on permitted medical examinations. As stated above, a "claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Orthoflex, Inc.*, 983 F.Supp.2d at 873 (quoting *Bennett*, 936 F.Supp.2d at 781)). To the extent Barnard is attempting in her response brief to assert a § 12112(d)(4)(A) claim based on L-3's Policy, the court holds that L-3 is entitled to summary judgment on this claim.[21]

---

[21]To the extent Barnard argues that she was not a "direct threat" to herself or others because her sedentary desk computer job duties involved sitting at an office desk working

VI

The court now turns to Barnard's age discrimination claims brought under the ADEA and the TCHRA.

A

Because Barnard relies on circumstantial evidence, her age discrimination claims are properly analyzed under the *McDonnell Douglas* framework.[22] *See, e.g., Reynolds v. Sovran Acquisitions, L.P.*, 650 Fed. Appx. 178, 180 (5th Cir. 2016) (ADEA claim); *Reed*, 701 F.3d

at a computer daily, her argument is misplaced. Under the ADA, an employer is relieved of liability for an adverse employment action that would otherwise violate the ADA by showing the employee posed a direct threat to the health or safety of others. *See* 42 U.S.C. § 12113(a)-(b) ("It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards [defined to include 'a requirement that an individual shall not pose a direct theat to the health or safety of other individuals in the workplace'] that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation."). Because showing that the plaintiff is a "direct threat," or that the qualification standards are "job-related" and "consistent with business necessity" is a *defense*, and because Barnard has neither pleaded nor adduced evidence that would enable a reasonable jury to find that L-3's Policy screens out or tends to screen out or otherwise deny a job or benefit to an individual with a disability, in violation of § 12112(d)(4)(A), the court does not address Barnard's "direct threat" and related arguments.

[22]In *Gross* the Supreme Court noted that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context." *Gross*, 557 U.S. at 175 n.2. The Court relied instead on a textual analysis of the ADEA to resolve the question whether a plaintiff can succeed on a "mixed-motives" claim of age discrimination. *Id*. at 175-77. Absent Supreme Court authority, the court will follow the Fifth Circuit's post-*Gross* precedent and apply *McDonnell Douglas* to ADEA cases. *See, e.g., Smith v. Bd. of Supervisors of S. Univ.*, 656 Fed. Appx. 30, 34 (5th Cir. 2016) (per curiam) ("Claims for age discrimination under the ADEA are also evaluated under the *McDonnell Douglas* framework." (citation omitted)).

at 439 ("Where, as here, a plaintiff relies on circumstantial evidence, Texas courts apply the familiar *McDonnell Douglas* burden-shifting framework to [discrimination] claims under the TCHRA."). In an age discrimination case, a plaintiff can establish a prima facie case by showing that "(1) [s]he was discharged; (2) [s]he was qualified for the position; (3) [s]he was within the protected class at the time of discharge; and (4) [s]he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age." *Campbell*, 2015 WL 3903539, at *3 (quoting *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010)). Second, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action taken against the employee. *See St. Mary's Honor Ctr.*, 509 U.S. at 506-07. The employer's burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West*, 330 F.3d at 385. Third, for an ADEA claim,

> [i]f the employer satisfies this burden, the burden shifts back to the employee to prove either that the employer's proffered reason was not true—but was instead a pretext for age discrimination—or that, even if the employer's reason is true, he was terminated because of his age. An employee may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. But a reason cannot be proved to be a pretext *for discrimination* unless it is shown both that the reason was false, and that discrimination was the real reason.

*Flanner v. Chase Inv. Servs. Corp.*, 2015 WL 408602, at *2 (5th Cir. Feb. 2, 2015) (per curiam) (footnotes and internal quotation marks omitted). For a TCHRA-based age discrimination claim, however, the employee can prove "'either (1) the reason stated by the

employer was a pretext for discrimination, or (2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor ("mixed motive")." *Reed*, 701 F.3d at 439-40 (quoting *Michael v. City of Dallas*, 314 S.W.3d 687, 691 (Tex. App. 2010, no pet.)).

B

L-3 moves for summary judgment on the ground that Barnard cannot establish the fourth element of her prima facie case of age discrimination[23] because her position remained open after her termination (although Ingram assumed some of Barnard's job duties when she was promoted, Ingram did not replace Barnard), and Barnard cannot show that she was otherwise discharged because of her age. Barnard responds that in April 2015 Chandler told her that the Procurement Department would be downsizing but that Barnard's group would be unaffected; Barnard was assigned duties as a trainer for a much younger inter-department transfer—Heather Dixon ("Dixon"), who was approximately 38 years old—only a week or so before she was selected for a drug test; Barnard was one of the older, more tenured employees in her department; after Barnard's termination, Ingram, who was then approximately 38 years old, assumed Barnard's former job duties and responsibilities; and Barnard was not given the same projects and opportunities to train in her work group like her much younger colleague, Dixon. Because the court addresses all of these arguments in its

---

[23]Although L-3 disputes that Barnard was "qualified" in the context of her disability discrimination claim, it appears to only challenge the fourth element of Barnard's prima facie case of age discrimination.

pretext analysis, *see infra* at § VI(D), it will assume *arguendo* that Barnard has established a prima facie case of age discrimination.

## C

The burden now shifts to L-3 to articulate a legitimate, nondiscriminatory reason for discharging Barnard. *St. Mary's Honor Ctr.*, 509 U.S. at 506-07. For the reasons discussed above, *see supra* § IV(C), the court concludes that L-3 has satisfied its burden.

## D

The burden now shifts back to Barnard to produce sufficient evidence for a reasonable jury to find that L-3's articulated reason is pretextual.[24] To establish pretext, Barnard must introduce sufficient evidence for a reasonable jury to find that L-3's "proffered explanation is false or unworthy of credence." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (citation and internal quotation marks omitted).

Barnard does not dispute any of L-3's proffered reasons for her discharge. Instead, she appears to base her age discrimination claims on evidence that she was one of the older, more tenured employees in her department; she was tasked with training a younger employee the week before being selected for a drug test; she was not offered any warning in lieu of termination or offered any counseling or corrective action or other alternatives, and was not

---

[24]Although Barnard is permitted under the TCHRA to establish a claim for age discrimination under a mixed-motives theory, she neither pleads a mixed-motives theory in her complaint nor argues in her response brief that L-3's proffered reason for her termination, while true, was only one reason for its conduct and discrimination is another motivating factor. *Reed*, 701 F.3d at 439-40.

advised by anyone at L-3 to contact her physician to rectify the situation per section 2.6 of the Policy; a younger employee assumed Barnard's former job duties and responsibilities after her termination; and she "was not given the same projects and opportunities to train in her work group like her much younger colleague [Dixon]." P. Br. 47. A reasonable jury could not find, based on the evidence, that L-3's proffered reasons for Barnard's discharge were a pretext for age discrimination.

Barnard argues in her response that she was not given the same projects and training opportunities as younger employees. In support of this contention, she cites her deposition, in which she testified:

> [d]ifferent things were given to different—or to the others that wasn't—or different opportunities, different projects were given to the other two girls that wasn't asked of me. I have no idea why they weren't asked of me. . . . [D]uring my working in the group, I feel that I wasn't given the opportunities that they were to learn more.

P. App. 7. This vague statement that "others" were given "different opportunities" is insufficient to permit a reasonable jury to conclude that L-3 afforded younger employees better projects, opportunities, or training. Moreover, Barnard's statement that she had "no idea" why she was not given the same opportunities as others in the group undercuts her contention that she was denied these opportunities *because of her age*. And Barnard's statement in her affidavit that "I was not given the same projects and opportunities to train in my work group like my much younger colleague Heather Dixon," *id.* at 136, only supports the conclusion that L-3 treated Dixon differently than it treated Barnard. It would not enable

a reasonable jury to find that the real reason for Barnard's discharge was her age.

Barnard contends that she should have been given a warning in lieu of termination, that she should have been offered counseling or corrective action or other alternatives, or that she should have been advised to contact her physician to rectify the situation, as provided for in the Policy. These arguments generally do not constitute evidence that can be relied upon to show pretext. "The ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers." *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988) (citing *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 647 (5th Cir. 1985); *Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983)). "The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated." *Id.* at 1508 (citations omitted). Barnard has not adduced evidence that would enable a reasonable jury to find that L-3's reason for discharging her was pretextual. For example, Barnard does not contend that L-3 offered a warning, counseling, or another alternative to *younger* employees who violated L-3's Policy or failed a drug test.

Finally, Barnard contends that she was 49 years old when she was terminated, that she was asked to train a younger employee, and that her job duties were assumed by a younger employee after she was terminated. None of these facts is sufficient to permit a reasonable jury to find that L-3's proffered reasons for Barnard's termination were pretext for age discrimination.

In sum, the most Barnard has done is create a weak fact issue as to whether L-3's proffered reason for her termination—violations of its Policy—was the real reason for her termination. As explained above, "[t]he ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is . . . correct.'" *Reeves*, 530 U.S. at 146-47 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 524). "In other words, '[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Id*. at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519). Aside from the fact that Barnard was 49 years old when she was terminated and her job duties were assumed by another employee who was ten years younger, Barnard has presented no evidence that would enable a reasonable jury to find that her age, as opposed to some other reason, was the but-for cause of her termination. Accordingly, the court grants L-3's motion for summary judgment on this claim.[25]

---

[25]Because the court is granting L-3's motion for summary judgment and dismissing this action, it denies as moot L-3's motion to strike portions of Barnard's appendix.

* * *

For the reasons explained, the court grants L-3's motion for summary judgment and dismisses this action by final judgment filed today.

**SO ORDERED**.

August 30, 2017.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE